[Cite as *State v. Houser*, 2026-Ohio-1339.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## VAN WERT COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

RYAN E. HOUSER,

    DEFENDANT-APPELLANT.

CASE NO. 15-25-06

OPINION AND
JUDGMENT ENTRY

---

**Appeal from Van Wert County Common Pleas Court
Trial Court No. CR-23-11-127**

**Judgment Affirmed**

**Date of Decision:  April 13, 2026**

---

**APPEARANCES:**

    *Rafael A. Villegas* **for Appellant**

    *Eva J. Yarger* **and** *Morgan A. Jackson* **for Appellee**

**ZIMMERMAN, P.J.**

{¶1} Defendant-appellant, Ryan E. Houser ("Houser"), appeals the June 24, 2025 judgment entry of sentence of the Van Wert County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case arises from the September 4, 2023 shooting death of the victim. Following the discovery of her body, law enforcement identified Houser—her on-again, off-again boyfriend—as a suspect based on his history of threatening her life and video surveillance placing him near the scene around her estimated time of death. During initial questioning with law enforcement, Houser implicated himself by demonstrating knowledge that the victim had been shot before police disclosed her cause of death. Although Houser consented to a search of his cell phone during interviews with law enforcement, investigators nonetheless sought a warrant to search his cloud data. Subsequent forensic analysis ultimately revealed that Houser had deleted information from his phone.

{¶3} On November 2, 2023, Houser was indicted by the Van Wert County Grand Jury on Count One of aggravated murder in violation of R.C. 2903.01(A), 2929.02(A), an unclassified felony; Count Two of murder in violation of R.C. 2903.02(A), (D), 2929.02(B), an unclassified felony; Count Three of tampering with evidence in violation of R.C. 2921.12(A)(1), (B), a third-degree felony; and Count Four of having weapons while under disability in violation of R.C. 2923.13(A)(3),

(B), a third-degree felony. Houser appeared for arraignment on November 7, 2023 and pleaded not guilty to the indictment. On September 10, 2024, Houser filed a notice of alibi defense.

{¶4} As relevant to this appeal, Houser filed multiple motions to suppress evidence in 2024 in which he sought suppression of statements that he made to law enforcement as well as arguing that the search warrant for his cell phone lacked a sufficient nexus to establish probable cause, was unconstitutionally vague, and exceeded its lawful scope by authorizing access to cloud-based data. The State opposed Houser's motions. After a hearing on May 6, 2024, the trial court on August 6, 2024 denied Houser's motion to suppress statements made during September 2023 interviews but suppressed statements made during the October 19, 2023 interview. Then, after a hearing on September 3, 2024, the trial court on September 11, 2024 denied Houser's motion to suppress evidence obtained from the search of the cloud storage from his cell phone, concluding that the warrant affidavit established a sufficient nexus between the crime and the data, and alternatively, that the good faith exception applied.

{¶5} On July 8, 2024, Houser filed a motion to dismiss Count Four of the indictment. The State filed a memorandum in opposition to Houser's motion to dismiss on July 16, 2024, and Houser filed his reply that same day. On July 18, 2024, Houser filed motions to exclude evidence related to gunshot residue ("GSR") testing and to declare R.C. 2929.03(A)(1)—aggravated murder sentencing—

unconstitutional. The State filed a memorandum in opposition to Houser's motion to exclude the GSR evidence on July 26, 2024. On August 20, 2024, the trial court denied Houser's motion to dismiss Count Four. That same day, the trial court denied Houser's motion requesting that the trial court declare R.C. 2929.03(A)(1) unconstitutional as not yet ripe.

{¶6} On October 1, 2024, Houser withdrew his motion regarding the GSR evidence after the laboratory technician filed a report. Additionally, the parties stipulated to Houser's prior drug-related conviction, and Houser maintained his constitutional challenge. Nevertheless, on October 5, 2024, Houser filed a motion to exclude the laboratory technician's report regarding the GSR evidence, which the State opposed on October 17, 2024. Following these filings, the trial court held a *Daubert* hearing on January 21, 2025 to address the admissibility of the GSR report. On February 3, 2025, the trial court denied Houser's motion to exclude the GSR evidence after concluding that the expert's testing and testimony satisfied the *Daubert* standard for relevance and reliability.

{¶7} On August 14, 2024, Houser filed a motion requesting the trial court to accept jurisdiction over a related Mercer County case involving a charge of having weapons while under disability. The State opposed Houser's request, and the trial court denied the motion on September 16, 2024.

{¶8} On March 6, 2025, Houser withdrew his not guilty pleas and entered a plea of no contest, under a written plea agreement, to Count Two of the indictment.

In exchange for his change of plea, the State agreed to dismiss Counts One, Three, and Four and to recommend that his sentence be served concurrently to the Mercer County case. The trial court accepted Houser's no contest plea, found him guilty of Count Two, and ordered a presentence investigation.[1]

{¶9} On May 12, 2025, Houser filed a motion requesting to withdraw his no contest plea based on a claim of actual innocence, which the State opposed. On May 29, 2025, the trial court denied Houser's presentence motion to withdraw his no contest plea.

{¶10} On June 24, 2025, the trial court sentenced Houser to a mandatory minimum term of 15 years in prison to a maximum term of life in prison.

{¶11} On June 30, 2025, Houser filed his notice of appeal. He raises two assignment of error for our review.

**First Assignment of Error**

**The Trial Court's denial of appellant's motion to withdraw his no contest plea is an abuse of discretion and should have liberally been granted as the withdrawal occurred prior to sentencing.**

{¶12} In his first assignment of error, Houser argues that the trial court abused its discretion by denying his presentence motion to withdraw his no contest plea despite his claim of actual innocence. Specifically, he contends that the trial court failed to apply the liberal standard to his request and incorrectly weighed the

---

[1] At sentencing, the trial court dismissed Counts One, Three, and Four of the indictment.

nine-factor analysis, specifically regarding the lack of prejudice to the State and his claim of actual innocence.

*Standard of Review*

{¶13} "Appellate review of the trial court's denial of a motion to withdraw a [no contest] plea is limited to whether the trial court abused its discretion." *State v. Streeter*, 2009-Ohio-189, ¶ 12 (3d Dist.). An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

*Analysis*

{¶14} "Criminal Rule 32.1 provides that a defendant is permitted to file a presentence motion to withdraw a no contest plea." *State v. Driscol*, 2022-Ohio-1810, ¶ 15 (3d Dist.). "Generally, 'presentence motion[s] to withdraw . . . [no contest] plea[s] should be freely and liberally granted.'" *Id.*, quoting *State v. Xie*, 62 Ohio St.3d 521, 527 (1992). "However, '[a] defendant does not have an absolute right to withdraw a [no contest] plea prior to sentencing.'" *Id.*, quoting *Xie* at paragraph one of the syllabus. "As a result, a 'trial court must conduct a hearing to determine whether there is a reasonable and legitimate basis for withdrawal of the plea.'" *Id.*, quoting *Xie* at paragraph one of the syllabus.

{¶15} When reviewing a trial court's denial of a presentence motion to withdraw a no contest plea, this court balances nine non-exhaustive factors: (1) whether the withdrawal will prejudice the prosecution; (2) the quality of defense

counsel's representation; (3) the adequacy of the Crim.R. 11 hearing; (4) the scope of the hearing on the motion to withdraw; (5) whether the trial court afforded the motion full and fair consideration; (6) the reasonableness of the motion's timing; (7) the reasons asserted for the withdrawal; (8) the defendant's understanding of the charges and potential penalties; and (9) whether the defendant maintains a claim of innocence or a complete defense. *Id*. at ¶ 16. *See State v. Edwards*, 2023-Ohio-3213, ¶ 8-9 (3d Dist.) (clarifying that the nine-factor analysis remains the applicable standard of review for presentence motions to withdraw a plea unless the defendant alleges that he or she became aware of new evidence that would have affected their decision to enter the plea). "None of the factors is determinate on its own and there may be numerous additional aspects weighed in each case." *Driscol* at ¶ 16

{¶16} In this case, the trial court denied Houser's presentence motion to withdraw his no contest plea after applying the reasonable-and-legitimate-basis factors and determining that the factors weighed in favor of the State. In particular, the trial court emphasized that withdrawing the plea would prejudice the State because its GSR expert had retired and a separate plea negotiation in Mercer County had been finalized based on this case's anticipated outcome. Moreover, as to Houser's claim of actual innocence, the trial court determined that the record was consistent with guilt, specifically noting Houser's "outburst" to his mother revealing knowledge that the victim was shot before law enforcement had released that information, as well as video evidence contradicting his timeline. (Doc. No. 151).

Furthermore, the trial court determined that the timing of Houser's motion was unreasonable because it was made orally at his sentencing hearing. Ultimately, the trial court concluded that Houser was represented by competent counsel, fully understood the mandatory sentence, and failed to provide a reasonable and legitimate basis for withdrawal.

{¶17} On appeal, Houser contends that the trial court abused its discretion by denying his presentence motion to withdraw his no-contest plea based on factors one, seven, and nine. Specifically, he argues that the trial court erroneously found prejudice regarding his plea in the Mercer County case and the State's GSR expert's retirement, which he characterizes as a foreseeable scheduling issue rather than undue prejudice to the prosecution. Regarding his claim of actual innocence, Houser asserts that he presented compelling expert testimony contesting the State's time-of-death calculation and video timeline, which established a plausible defense sufficient to warrant withdrawal. In sum, he argues that the trial court failed to apply the free and liberal standard, treating his motion as a mere change of heart rather than a legitimate assertion of a defense.

{¶18} Based on our review of the record in this case, we conclude that the trial court did not abuse its discretion by denying Houser's presentence motion to withdraw his no contest plea. Indeed, the factors Houser leaves unchallenged on appeal—specifically factors two, three, four, five, and six—weigh against withdrawal. As to the second factor, the record is replete with evidence supporting

that Houser received competent representation throughout the proceedings. He was represented by multiple attorneys, including experienced retained counsel who vigorously pursued pretrial motions and successfully negotiated a plea agreement that resulted in the dismissal of three out of four charges, including the most serious charge of aggravated murder.

{¶19} As to the third factor, it is undisputed that the trial court conducted a thorough Crim.R. 11 colloquy, ensuring that Houser's plea was knowing, intelligent, and voluntary. The fourth and fifth factors—regarding the extent of the withdrawal hearing and whether the court gave full and fair consideration to the motion—also weigh heavily against withdrawal. Importantly, following Houser's oral request to withdraw (at his sentencing hearing), the trial court afforded him a full opportunity to be heard, permitting the parties to file written pleadings and subsequently present evidence and arguments at a formal hearing. After receiving this evidence, including the report from Houser's expert witness, the trial court issued a detailed judgment entry analyzing each of the nine factors.

{¶20} Further, regarding the sixth factor, Houser conceded that the timing of his motion to withdraw his plea—made orally at the very moment of the sentencing hearing—was unreasonable. Indeed, "a motion to withdraw a guilty plea made on the day of the sentencing hearing is not made at a reasonable time." *State v. Estep*, 2024-Ohio-58, ¶ 30 (4th Dist.), citing *State v. Harris*, 2010-Ohio-4127, ¶ 31 (10th

Dist.), *State v. Hassink*, 2000 Ohio App. LEXIS 5509, *13 (7th Dist. Nov. 20, 2000), and *State v. Caballero*, 2016-Ohio-5496, ¶ 20 (10th Dist.).

**{¶21}** Turning to the remaining factors challenged by Houser—factors one, seven, and nine—we likewise conclude that these factors do not weigh in Houser's favor. As to the first factor, we agree that the State would have been prejudiced by the withdrawal. Ohio courts classify the prejudice to the State "as the most important factor in the balancing test." *State v. Zimmerman*, 2010-Ohio-4087, ¶ 23 (10th Dist.). "Prejudice to the State '[g]enerally . . . involves one or more witnesses becoming unavailable due to the delay in the trial resulting from the plea withdrawal.'" *State v. Preston*, 2013-Ohio-4404, ¶ 31 (2d Dist.), quoting *State v. Boyd*, 1998 Ohio App. LEXIS 4914, *15 (10th Dist. Oct. 22, 1998).

**{¶22}** In this case, the State established precisely this type of prejudice. Specifically, at the hearing on Houser's motion, the State represented that the GSR expert witness would "be retiring prior to any rescheduled trial date and that would require another witness to re-test and re-examine the evidence and potentially have another suppression hearing [*Daubert*] on that witness." (Tr. at 215). *See State v. Isaacs*, 2005-Ohio-2682, ¶ 14 (6th Dist.) (asserting that a prosecutor's statement regarding the potential unavailability of a material witness constituted sufficient evidence that granting the motion to withdraw would prejudice the prosecution).

**{¶23}** Furthermore, the GSR expert's testimony was vital to the State's case. Indeed, his testimony would have provided critical forensic evidence physically

linking Houser to the discharge of a firearm—evidence that would corroborate the State's timeline and contradict Houser's claim of innocence. Thus, since the record reflects not only the witness at issue but the nature of his testimony, we conclude that the State would be prejudiced by the plea withdrawal. *See Preston* at ¶ 32 (noting that, to demonstrate prejudice based on witness unavailability, the State should identify the specific witness, describe the substance of their anticipated testimony, and explain how that testimony is essential to the State's case).

**{¶24}** Moreover, the State would suffer additional prejudice due to the global resolution encompassing both Houser's plea in this case and the plea agreement in his related Mercer County criminal case. *See State v. Leasure*, 2024-Ohio-47, ¶ 9 (Donnelly, J., dissenting) (recognizing that plea agreements are contracts and that the parties are entitled to the "benefit of their bargain," noting that "[e]ach side agrees to withstand a detriment in exchange for a desired benefit" and that the State relies on securing a conviction and sentence in exchange for its concessions). Critically, the record reflects that Houser's plea in this case was inextricably linked to the Mercer County proceedings, where Houser received a favorable concurrent sentence specifically in reliance on the finality of his conviction in this case. Because the State already performed its obligations under the related plea agreement, permitting Houser to withdraw his plea in this case would prejudice the State by unraveling the consideration given for the global resolution.

{¶25} Finally, as to factor seven—the stated reasons for the motion—which touches upon factor nine—whether the accused had a complete defense—Houser contends that withdrawal was justified by a claim of actual innocence, relying primarily on a report from his defense expert that estimated a time of death that purportedly contradicted the State's timeline. "'In weighing the ninth factor, "the trial judge must determine whether the claim of innocence is anything more than the defendant's change of heart about the plea agreement."'" *State v. Ferdinandsen*, 2016-Ohio-7172, ¶ 21 (3d Dist.), quoting *State v. Davis*, 2015-Ohio-5196, ¶ 19 (5th Dist.), quoting *State v. Davison*, 2008-Ohio-7037, ¶ 45 (5th Dist.). "'""A change of heart or mistaken belief about pleading guilty is not a reasonable basis for withdrawal of a guilty plea."'" *Id.*, quoting *State v. Jones*, 2011-Ohio-2903, ¶ 20 (7th Dist.), quoting *State v. Smith*, 2010-Ohio-5784, ¶ 9 (8th Dist.). "Claims of innocence must be substantiated." *Id.* While not a strict bar to withdrawal, a defendant's awareness of a possible defense at the time the plea was entered permits a trial court to reasonably conclude that a legitimate basis for withdrawal does not exist. *State v. North*, 2015-Ohio-720, ¶ 27 (3d Dist.). *See also State v. DeJesus*, 2015-Ohio-4111, ¶ 21 (2d Dist.) (confirming that "[d]enial of a pre-sentence motion to withdraw a guilty plea [is] not . . . an abuse of discretion where the motion [is] based upon a complete defense that the defendant was aware of when he entered the plea").

{¶26} Here, under the specific facts and circumstances of this case, we conclude that factors seven and nine do not weigh in Houser's favor. Importantly, the specific facts and circumstances of this case reflect that Houser's request to withdraw his plea was motivated by a change of heart rather than a newly realized defense. *See State v. Edds*, 2019-Ohio-4898, ¶ 24-25 (6th Dist.). Indeed, the record in this case reflects that Houser was fully aware of this possible defense well before entering his plea. *See North* at ¶ 25. Critically, the expert report outlining Houser's potential defense is dated January 23, 2025. Thus, Houser had over a month to weigh this evidence with his trial counsel before proceeding to enter his no-contest plea on March 6, 2025. The record demonstrates that Houser knowingly bypassed this specific defense to secure a favorable plea agreement, which resulted in the dismissal of three of his four charges, including the most serious offense. Therefore, because he offered no additional circumstances to explain his subsequent reversal, the trial court could reasonably conclude that relying on that exact same evidence did not constitute a legitimate basis for withdrawal. *See State v. Littlefield*, 2004-Ohio-5996, ¶ 12 (4th Dist.).

{¶27} In sum, an evaluation of the nine plea-withdrawal factors demonstrates that none weigh in Houser's favor. Because none of the factors weigh in his favor, Houser failed to establish a reasonable and legitimate basis to withdraw his plea. *See State v. Haskell*, 2015-Ohio-1885, ¶ 28 (3d Dist.). Therefore, the trial court did

not abuse its discretion by denying Houser's presentence motion to withdraw his no contest plea.

{¶28} Houser's first assignment of error is overruled.

## Second Assignment of Error

**The trial court erred in denying Appellant's motion to suppress because the search warrant for Appellant's cell phone was unconstitutionally vague and exceeded its lawful scope by authorizing access to cloud based data.**

{¶29} In his second assignment of error, Houser argues that the trial court erred by denying his motion to suppress evidence derived from the search of his cell phone's cloud-based data. Specifically, he contends that his initial consent to search the physical device did not extend to the cloud-based data; the warrant itself was unconstitutionally vague; and the search warrant affidavit lacked the necessary probable cause to justify the search. He further asserts that, even in the alternative, the good-faith exception cannot prevent suppression because the warrant and affidavit were too deficient to be reasonably relied on.

*Standard of Review*

{¶30} A review of the denial of a motion to suppress involves mixed questions of law and fact. *State v. Burnside*, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See also State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to

-14-

suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8. With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*.

*Analysis*

{¶31} "The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution generally prohibit warrantless searches and seizures, and any evidence that is obtained during an unlawful search or seizure will be excluded from being used against the defendant." *State v. Tyson*, 2015-Ohio-3530, ¶ 9 (3d Dist.). "Generally, any evidence obtained in violation of the Fourth Amendment, as well as any evidence seized subsequent to such violation, must be suppressed as 'fruit of the poisonous tree.'" *State v. Fielding*, 2014-Ohio-3105, ¶ 15 (10th Dist.), quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). *See also State v. Jenkins*, 2010-Ohio-5943, ¶ 9 (3d Dist.) (The Fourth Amendment does not explicitly provide "that violations of its provisions against unlawful searches and seizures will result in the suppression of evidence obtained as a result of such violation, but the United States Supreme Court has held that the exclusion of evidence is an essential part of the Fourth Amendment.").

{¶32} To prevent such unlawful intrusions, the Fourth Amendment mandates that search warrants be issued "only 'upon probable cause.'" *State v. Gonzales*,

2014-Ohio-557, ¶ 18 (3d Dist.), quoting U.S. Const., amend. IV. "'A neutral and detached judge or magistrate may issue a search warrant only upon the finding of probable cause.'" *State v. Craw*, 2018-Ohio-1769, ¶ 15 (3d Dist.), quoting *State v. Young*, 146 Ohio App.3d 245, 253-254 (11th Dist. 2001), citing *United States v. Leon*, 468 U.S. 897, 916 (1984). "'Probable cause "means less than evidence which would justify condemnation," so that only the "probability, and not a prima facie showing of criminal activity is the standard of probable cause."'" *Id.*, quoting *Gonzales* at ¶ 18, quoting *State v. George*, 45 Ohio St.3d 325, 329 (1989). To justify a search for evidence of a crime, there must be a nexus connecting the item to be seized with the criminal behavior, along with sufficient cause to believe that the evidence sought will assist in a particular apprehension or conviction. *Gonzales* at ¶ 18.

{¶33} In determining the sufficiency of probable cause, the issuing authority must make a practical, common-sense decision based on the totality of the circumstances presented in the affidavit. *George* at paragraph one of the syllabus. This evaluation includes assessing the "'veracity' and 'basis of knowledge'" of any individuals providing information to determine if there is a "fair probability" that evidence of a crime will be found in the specific location to be searched. *Id.*, quoting *Illinois v. Gates*, 462 U.S. 213, 238-239 (1983). *See also State v. Swing*, 2017-Ohio-8039, ¶ 40 (12th Dist.) ("Simply stated, a search warrant will be held sufficiently particular when it enables a searcher to reasonably ascertain and identify the things

that are authorized to be seized."). "In other words, the issuing authority must examine the 'totality-of-the-circumstances' in determining whether probable cause exists to issue a search warrant." *Craw* at ¶ 15, quoting *George* at 329.

{¶34} "'When reviewing the sufficiency of an affidavit in support of a search warrant, both the trial court and the appellate court are limited to the information that was "brought to the attention of the [issuing authority]."'" *Id.* at ¶ 16, quoting *State v. Garza*, 2013-Ohio-5492, ¶ 10 (3d Dist.), quoting *State v. Graddy*, 55 Ohio St.2d 132, 134 (1978), fn. 1. "Frequently, 'the reviewing court is bound by the "four corners" of the affidavit, as that is often the only record available before it.'" *Id.*, quoting *Garza* at ¶ 10. When reviewing a probable-cause determination, an appellate court does not conduct a de novo review of the affidavit to decide if it would have issued the warrant itself. Instead, the court's duty is to ensure that the issuing authority had a substantial basis for concluding that probable cause existed. *Id.*, citing *George* at paragraph two of the syllabus. *See also Garza* at ¶ 19 (reasserting that appellate review of an issuing judge's probable-cause determination is limited to ensuring there was a "substantial basis" for concluding that probable cause existed).

{¶35} "'There is interplay between probable cause, particularity, and reasonableness'" when determining the validity of a search warrant. *State v. Mack*, 2025-Ohio-4812, ¶ 54 (5th Dist.), quoting *State v. Castagnola*, 2015-Ohio-1565, ¶ 70. To satisfy the particularity requirement, a warrant must provide sufficient

information to "'"guide and control"'" the executing officer's judgment and avoid overbroad categories. *Id.* at ¶ 55, quoting *Castagnola* at ¶ 79, quoting *United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999). Even where a warrant lists broad categories of items, it remains valid provided the description is as specific as the circumstances and nature of the investigation permit. *Id.* "'Warrants that fail to describe the items to be seized with as much specificity as the government's knowledge and the circumstances allow are "invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized."'" *Id.*, quoting *Castagnola* at ¶ 80, quoting *United States v. Fuccillo*, 808 F.2d 173, 176 (1st Cir. 1987).

{¶36} The application of these principles is particularly nuanced in the context of digital evidence. "'The modern development of the personal computer and its ability to store and intermingle a huge array of one's personal papers in a single place increases law enforcement's ability to conduct a wide-ranging search into a person's private affairs, and accordingly makes the particularity requirement much more important.'" *Castagnola* at ¶ 74, quoting *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009). However, "the Fourth Amendment does not require heightened protections for computers, nor does it diminish its protections because of the challenges of searching them." *Id.* "The 'bedrock principle' is 'reasonableness on a case-by-case basis.'" *Id.*, quoting *United States v. Richards*, 659 F.3d 527, 538 (6th Cir. 2011). Thus, while the Fourth Amendment does not

require a search warrant to specify restrictive search protocols, it does mandate that officers describe what they believe will be found on a digital device with as much specificity as possible under the circumstances to enable the searcher to narrow the search—a requirement that is especially important when the person conducting the search is not the affiant. *Mack* at ¶ 56, citing *Castagnola* at ¶ 88.

**{¶37}** On appeal, Houser argues that the trial court erred by denying his motion to suppress the digital evidence, raising a multi-tiered challenge to the search of his cloud-based data. Specifically, he contends that his initial consent to search the physical phone did not encompass data stored on remote servers. He further asserts that the search warrant was unconstitutionally overbroad and that the supporting affidavit relied on improper generalizations, failing to establish a sufficient probable-cause nexus between the alleged offenses and his digital storage. Finally, he argues that the good-faith exception cannot salvage the search because law enforcement's reliance on such a facially deficient warrant was objectively unreasonable.

*Consent*

**{¶38}** Notwithstanding Houser's focus on the validity of the warrant, he initially contends that the search of his cloud data exceeded the scope of his consent. As a foundational matter, "'neither a warrant nor probable cause is needed for a search where the person subject to the search gives consent.'" *State v. Davis*, 2020-Ohio-619, ¶ 36 (3d Dist.), quoting *State v. Marland*, 2017-Ohio-4353, ¶ 24 (3d

Dist.). "In order to be valid, consent must be voluntary." *Marland* at ¶ 24. "Whether consent is voluntary or is instead the product of duress or coercion is a question of fact to be determined based on the totality of the circumstances." *Davis* at ¶ 36.

{¶39} In this case, Houser does not dispute consenting to the search of his cell phone on two occasions or contest the validity of his consent. Instead, he argues that the scope of his consent was strictly limited to the physical device and did not extend to his cloud data stored on remote servers. "The Supreme Court of Ohio has held that '[t]he standard for measuring the scope of consent under the Fourth Amendment is objective reasonableness, i.e., what a typical reasonable person would have understood by the exchange between the officer and the suspect.'" *State v. Dasen*, 2017-Ohio-5556, ¶ 43 (9th Dist.), quoting *State v. Roberts*, 2006-Ohio-3665, ¶ 99. *See also United States v. Perez*, 712 Fed.Appx. 136, 140 (3d Cir. 2017) ("In the absence of statutes and doctrine that better address rapidly evolving technology, the manner of searching digital storage is circumscribed by objective reasonableness rather than specific search protocols.").

{¶40} In evaluating what is objectively reasonable, jurisprudence analyzing the permissible scope of digital search warrants provides an instructive framework. In that context, courts have generally recognized that a warrant to search a device also extends to the files and records stored therein or accessible through it. *United States v. Pompy*, 2021 U.S. Dist. LEXIS 48995, *10-11 (E.D.Mich. Mar. 16, 2021),

citing *United States v. Fuller*, 77 Fed.Appx. 371, 377 (6th Cir. 2003) and *United States v. Newman*, 2020 U.S. Dist. LEXIS 221891, *3 (E.D.Tenn. Sep. 8, 2020). Indeed, even where a warrant does not explicitly list computer data, the authority to search for "records" generally encompasses the seizure of digital files if it is reasonable to believe the computer serves as a repository for such evidence. *Id.*, citing *United States v. Lucas*, 640 F.3d 168, 177-178 (6th Cir. 2011).

**{¶41}** This broad scope is necessary because "[t]he scope of the privacy interests at stake is further complicated by the fact that the data a user views on many modern cell phones may not in fact be stored on the device itself." *Riley v. California*, 573 U.S. 373, 397 (2014). As the United States Supreme Court explained, this is due to "cloud computing," which is "the capacity of Internet-connected devices to display data stored on remote servers rather than on the device itself." *Id.* Because the same type of data may be stored locally on the device for one user and in the cloud for another, users often do not know where their information is actually stored, and the distinction "generally makes little difference." *Id.*

**{¶42}** However, because we ultimately conclude that the search was independently justified by a valid search warrant—or, alternatively, law enforcement's good-faith reliance on the warrant—we need not resolve whether Houser's initial consent to search his physical device extended to its associated cloud data. Indeed, our review of the totality of the circumstances presented by this

case reveals that the warrant was sufficiently particular and based on probable cause to search Houser's cell phone and corresponding cloud data, and alternatively, that the executing officers acted in objectively reasonable good faith.

*Warrant Particularity*

**{¶43}** Specifically, our review of the warrant that was issued in this case reveals that it was sufficiently particular. *See United States v. Pelayo*, 2023 U.S. App. LEXIS 19624, *3-4 (9th Cir. July 31, 2023) (noting a warrant is not general when it describes the data to be disclosed and limits the search to outlined crimes). To satisfy the Fourth Amendment's particularity requirement, a search warrant must provide sufficient detail to "guide and control" the executing officer's discretion while remaining narrowly tailored to avoid the seizure of unrelated evidence. *Castagnola*, 2015-Ohio-1565, at ¶ 79. A warrant is not automatically invalid simply because it lists broad categories of items to be seized; rather, it remains valid so long as the description is """"as specific as the circumstances and the nature of the activity under investigation permit."""" *Id.* at ¶ 80, quoting *Guest v. Leis*, 255 F.3d 325, 336 (6th Cir. 2001), quoting *United States v. Henson*, 848 F.2d 1374, 1383 (6th Cir. 1988), quoting *United States v. Blum*, 753 F.2d 999, 1001 (11th Cir. 1985). "Warrants that fail to describe the items to be seized with as much specificity as the government's knowledge and the circumstances allow are 'invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics

of the goods to be seized.'" *Id.*, quoting *United States v. Fuccillo*, 808 F.2d 173, 176 (1st Cir. 1987).

**{¶44}** Because a computer's vast storage capacity creates a "'a greater potential for the "intermingling" of documents and a consequent invasion of privacy,'" executing officers "'must be clear as to what it is they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant.'" *Id.*, quoting *United States v. Walser*, 275 F.3d 981, 986 (10th Cir. 2001). "'[P]ractical accuracy rather than technical precision' is the operative consideration." *Id.*, quoting *United States v. Dorrough*, 927 F.2d 498, 500 (10th Cir. 1991).

**{¶45}** Importantly, the search warrant affidavit at issue in this case specifically identified the target device—a black Samsung cell phone along with its specific identification number—and requested authorization to search it for a broad array of digital data. This request listed specific categories including

> [m]essages, text messages, photos, multimedia messages, pictures and images, video and audio recordings, call history, logs to include, received calls, missed calls and dialed calls. Phonebook and contacts, calendar and test [sic] list entries, emails stored on the handset, internet browsing history, social networking artifacts, applicator artifacts, address books, expansion cards, subscriber phone number, deleted messages, location area identifier, and GPS historical data.

(State's Ex. 2). In addition to the data stored directly on the digital device, the search warrant affidavit requested permission to search "all associated cloud-based data" relevant to the crimes of aggravated murder, murder, voluntary manslaughter,

involuntary manslaughter, burglary, tampering with evidence, and abuse of a corpse. (*Id.*). To clarify the scope of this request, the search warrant affidavit explicitly defined "cloud-based storage" as any "off-site" storage solution, such as third-party servers, that allows a user to free up device memory while keeping data accessible through the device. (*Id.*). The search warrant that was subsequently issued authorized this request, reiterating the specific descriptions provided in the search warrant affidavit.

{¶46} We conclude that the detail contained in the search warrant affidavit, and subsequently the warrant itself, defeats Houser's vagueness argument since it expressly identified the target device, exhaustively listed the digital data to be searched, and explicitly limited the scope of the search to evidence of the listed offenses related to the homicide investigation. *Compare Mack*, 2025-Ohio-4812, at ¶ 62 (5th Dist.) (assessing that "the warrant at issue expressly incorporated the affidavit by reference, specified the device to be searched, the information being sought and the reason therefore, and where the information could be found on the phone"); *United States v. Conway*, 2018 U.S. Dist. LEXIS 119929, *37 (E.D.Ky. June 4, 2018) (finding a warrant sufficiently particularized because, when read as a whole and in context with the supporting affidavit, an authorization to search for evidence of "a crime" clearly referred to the specific offense under investigation). *See also State v. McCrory*, 2011-Ohio-546, ¶ 49 (6th Dist.) ("The overwhelming weight of authority is to the effect that warrants need not contain any sort of search

protocol, methodology, or other strategy restricting a computer search to specific programs or terms in order to satisfy the particularity requirement."). Consequently, we conclude that the warrant was sufficiently particular in its scope and did not constitute an unconstitutional general warrant.

*Probable Cause Nexus*

**{¶47}** Having established the warrant's particularity, we turn to Houser's argument that the affidavit lacked a sufficient nexus to establish probable cause.[2] Crim.R. 41(C) provides that an affidavit in support of a search warrant

> shall name or describe the person to be searched or particularly describe the place to be searched, name or describe the property to be searched for and seized, state substantially the offense in relation thereto, and state the factual basis for the affiant's belief that such property is there located.

"'When considering whether a nexus exists between the alleged crime and the place to be searched, "'the circumstances must indicate why evidence of illegal activity will be found in a particular place.'"'" *State v. Jones*, 2020-Ohio-6667, ¶ 37 (3d Dist.), quoting *State v. Phillips*, 2016-Ohio-5944, ¶ 14 (10th Dist.), quoting *United States v. Washington*, 380 F.3d 236, 240 (6th Cir. 2004), quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004). In making such an assessment, a

---

[2] "The probable cause 'nexus' requirement is not to be confused with the 'minimally sufficient nexus' requirement that Ohio courts . . . have applied in determining whether to apply the good faith exception to the exclusionary rule." *State v. Johnson*, 2024-Ohio-1147, ¶ 15, fn. 1 (1st Dist.), quoting *State v. Schubert*, 2022-Ohio-4604, ¶ 9-13. "The 'minimally sufficient nexus' requirement for the good faith exception is a distinct and lower standard than the probable cause 'nexus' requirement, and a 'minimally sufficient nexus' is insufficient for concluding a magistrate had a 'substantial basis' for probable cause." *Id.*

judicial officer may give considerable weight to the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is "entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." (Citations omitted.) *State v. Eng*, 2005-Ohio-375, ¶ 12 (1st Dist.).

{¶48} Considering the totality of the circumstances of this case (and being mindful of the deference provided to a neutral issuing authority's decision regarding the existence of probable cause), we conclude that the search warrant affidavit in this case sets forth sufficient facts to establish a nexus between the alleged criminal activity and Houser's cell phone and corresponding cloud data. To establish the necessary nexus between the target data and the crime, the affiant, Chief Deputy Kyle Fittro ("Chief Deputy Fittro") of the Van Wert County Sheriff's Office, averred that law enforcement sought this information as a direct result of their investigation into the victim's death, which led them to question Houser. To support the finding of probable cause, Chief Deputy Fittro averred that "people in possession of cellular phones, and engaged in illegal activities, commonly utilize these cellular phones in connection with these illegal activities and the cellular devices almost always hold records relating to these illegal activities." (State's Ex. 2).

{¶49} Nevertheless, pointing to this generalized assertion, Houser argues that the affidavit offered only improper conclusory generalizations to connect the crime to the targeted digital evidence. It is true that mere "'conclusory statements

do not provide an issuing judge with a substantial basis for determining the existence of probable cause, and instead "provid[e] virtually no basis at all for making a judgment regarding probable cause."'" *State v. Thompson*, 2021-Ohio-3390, ¶ 65 (4th Dist.), quoting *State v. Henderson*, 2019-Ohio-1974, ¶ 32 (9th Dist.), quoting *Gates*, 462 U.S. at 239. However, "established precedent . . . requires courts to examine the *totality of the circumstances* when evaluating whether a search-warrant affidavit sets forth specific facts giving rise to probable cause." (Emphasis added.) *Id.* at ¶ 66.

**{¶50}** Here, an examination of the affidavit as a whole establishes a sufficient nexus between the alleged criminal activity and the digital evidence sought. Importantly, the affidavit did not rest on Chief Deputy Fittro's generalization alone. Rather, it provided sufficient factual context demonstrating why Houser's device and corresponding cloud data were likely to hold evidence of the alleged criminal activity. As the trial court highlighted in its entry denying Houser's motion to suppress, the search warrant affidavit established that Houser and the victim were in a volatile "on-again/off-again" relationship where they "routinely fought," and that Houser had "threatened to kill" the victim previously. (Doc. No. 104). Furthermore, the trial court noted the search warrant affidavit detailed that the victim's own cell phone was missing from the scene, and that, during questioning, Houser admitted to being with the victim near the time of her demise and demonstrated unprompted knowledge that she had been shot.

**{¶51}** Nonetheless, Houser challenges the use of these facts to establish probable cause, contending that Chief Deputy Fittro improperly relied on hearsay evidence gathered by other investigating officers. There is no merit in this argument. "'Hearsay may serve as the basis for the issuance of a warrant as long as there is a substantial basis for crediting the hearsay.'" *State v. Courtney*, 2012-Ohio-989, ¶ 21 (3d Dist.), quoting *State v. Underwood*, 2005 Ohio 2309, ¶ 16 (4th Dist.). Critically, "'statements made to fellow police officers in the same investigation are an inherently reliable basis for another police officer to create an affidavit for a search warrant.'" *State v. Brown*, 2011-Ohio-1461, ¶ 24 (3d Dist.), quoting *State v. Bradley*, 1996 Ohio App. LEXIS 5685, *17 (3d Dist. Dec. 5, 1996). "So long as the officer reasonably believes the information to be true, hearsay information may be relied upon by an affiant, especially since practical considerations often require reliance on information provided by other sources." *Id.*, quoting *Bradley* at *17. Decisively, Chief Deputy Fittro explicitly averred that the facts within his affidavit were gathered from fellow law enforcement officers actively investigating the homicide. Because statements relayed between investigating officers provide an inherently reliable basis for probable cause, the issuing judge properly credited the information. *See id.*

**{¶52}** Consequently, examining the totality of the circumstances presented by this case, rather than isolating Chief Deputy Fittro's generalized statement about cell phone usage, the issuing judge could have reasonably inferred that the evidence

of these communications, threats, and relationship history would be found in the cloud data associated with Houser's cell phone. *See Mack*, 2025-Ohio-4812, at ¶ 50 (5th Dist.) (noting that, "with respect to the issuance of warrants 'due weight should be given "to inferences drawn from those facts by resident judges and local law enforcement officers."'"), quoting *State v. Grace*, 2023-Ohio-3781, ¶ 23 (5th Dist.), quoting *Ornelas v. United States*, 517 U.S. 690, 698 (1996). Therefore, we conclude that the search warrant affidavit set forth sufficient facts to establish a nexus between the alleged criminal activity and the targeted digital evidence.

**{¶53}** Moreover, safeguards were in place to prevent an overbroad search. Notably, Chief Deputy Fittro was the same officer conducting the forensic search. Consequently, his specific awareness of the case's scope and evidentiary bounds provided a safeguard that might be absent were the search conducted by an unrelated analyst without knowledge of the specific investigation. *See id.* at ¶ 62 (analyzing that the affiant was the same person who executed the warrant and "that the only information reviewed pursuant to that particular warrant was the security camera footage contained on the downloaded app").

**{¶54}** Finally, the record demonstrates that the issuing authority exercised actual review rather than acting as a rubber stamp. That is, even though the warrant application initially utilized boilerplate language common to drug investigations, it is clear that Chief Deputy Fittro and the issuing authority reviewed and amended the document, crossing out the inapplicable drug-crime references and inserting the

correct homicide information relevant to this case. This attention to detail confirms that the warrant was issued based on a specific consideration of the facts at hand.

{¶55} In sum, while the better practice would always be to explicitly detail the nexus between the device and the specific crime—such as citing specific witness statements confirming that Houser and the victim argued via text message—the affidavit here, when viewed in its totality, provided sufficient context to support a probable cause finding. *See, e.g.*, *United States v. McCall*, 84 F.4th 1317, 1328 (11th Cir. 2023) (suggesting that "[c]loud or data-based warrants with a sufficiently tailored time-based limitation can undermine any claim that they are the 'internet-era version of a "general warrant"'"), quoting *United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017). Therefore, we conclude that the issuing authority had a substantial basis to conclude that probable cause existed for the issuance of the search warrant in this case.

### Good-Faith Exception

{¶56} Nevertheless, even if the warrant was technically deficient, the good-faith exception to the exclusionary rule would apply. "'"The exclusionary rule operates to exclude evidence obtained by the government in violation of the United States Constitution."'" *Bd. of Trustees Blanchard Twp. v. Simon*, 2023-Ohio-1704, ¶ 46 (3d Dist.), quoting *State v. Hoffman*, 2013-Ohio-1082, ¶ 20 (6th Dist.), quoting *State v. Helton*, 2005-Ohio-1789, ¶ 14 (11th Dist.). "'"The purpose of this rule is to deter police misconduct."'" *Id.*, quoting *Hoffman* at ¶ 20, quoting *Helton* at ¶ 14.

"""The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence that is subsequently discovered and derivative of that prior illegality.""" *Id.*, quoting *Hoffman* at ¶ 20, quoting *State v. McLemore*, 2012-Ohio-521, ¶ 20 (2d Dist.). "Consequently, '"[t]he derivative-evidence rule, or fruit-of-the-poisonous-tree doctrine as it is widely known, requires suppression of evidence that was seized in a seemingly lawful manner but about which police learned because of a prior constitutional violation such as an illegal search or seizure.""" *Id.*, quoting *Hoffman* at ¶ 20, quoting *McLemore* at ¶ 20.

{¶57} "'The exclusionary rule does not apply to evidence police obtain in good faith in reliance on the validity of a warrant.'" *Id.* at ¶ 48, quoting *Hoffman* at ¶ 22. "'Under the good faith exception, we are to uphold searches when police reasonably and in good faith relied upon a warrant subsequently declared to be invalid, because excluding evidence under such circumstances would not deter police misconduct.'" *Id.*, quoting *Hoffman* at ¶ 22. *See also Gonzales*, 2014-Ohio-557, at ¶ 35 (3d Dist.) (acknowledging that the exclusionary rule's good-faith exception encompasses warrants found to be technically deficient due to a lack of probable cause or a failure of particularity).

{¶58} However, suppression remains appropriate under the good-faith exception when (1) the affiant misled the judge with knowingly or recklessly false information; (2) the judge wholly abandoned their neutral judicial role; (3) the

-31-

affidavit is so bare bones that a belief in probable cause is entirely unreasonable; or (4) the warrant is so facially deficient in its particularity that an officer cannot reasonably presume it to be valid. *Mack*, 2025-Ohio-4812, at ¶ 57 (5th Dist.).

**{¶59}** Based on our review of the record, we conclude that there is no evidence of the type of police misconduct or judicial abandonment that would preclude application of the good-faith exception. Indeed, there is no allegation or evidence in the record to suggest that Chief Deputy Fittro misled the issuing judge with knowingly or recklessly false information. Likewise, the record reflects that the issuing judge did not wholly abandon their neutral judicial role. Rather, the record reflects that the issuing judge actively reviewed the warrant by amending it to replace boilerplate drug-crime references with facts specific to this homicide investigation.

**{¶60}** Moreover, the search warrant affidavit was not so bare bones as to render official belief in probable cause entirely unreasonable. "'An affidavit that is so lacking in indicia of probable cause that no reasonable officer would rely on the warrant has come to be known as a "bare bones" affidavit.'" *State v. Shields*, 2024-Ohio-2317, ¶ 19 (5th Dist.), quoting *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2016). "An affidavit is considered 'bare bones' when it fails to establish a minimally sufficient nexus between the item or place to be searched and the underlying illegal activity." *Id.* "To avoid being labeled as 'bare bones,' an affidavit must" rely on more than mere suspicions or conclusions. *State v. Schubert*,

2022-Ohio-4604, ¶ 10. Instead, it must provide "underlying factual circumstances regarding veracity, reliability, and basis of knowledge" that successfully establish "some connection between the illegal activity and the place to be searched." (Citations omitted.) *Id.*

{¶61} Based on our review of the totality of the circumstances, we conclude that the search warrant affidavit established a minimally sufficient nexus between the offenses under investigation and the need to search Houser's cell phone and its associated cloud data. This nexus was anchored not in mere generalizations, but in specific factual allegations, including the victim's missing cell phone, Houser's history of threats and his volatile relationship with the victim, and Houser's unprompted statements revealing knowledge of the cause of death. *See State v. Maniaci*, 2017-Ohio-8270, ¶ 30 (3d Dist.). *But see State v. Hikec*, 2024-Ohio-1940, ¶ 28-29 (5th Dist.) (concluding that the good-faith exception was inapplicable where a digital warrant was "so facially deficient" because it relied on an improper "layered inference"—the mere possibility that an assault might have been recorded—without specific evidence linking the crime to the device's data).

{¶62} Finally, the warrant was not so facially deficient in its particularity that the executing officers could not reasonably presume it to be valid. Importantly, the warrant specifically identified the target Samsung device and limited the search to evidence of the outlined offenses—a limitation Chief Deputy Fittro was uniquely positioned to respect as both the affiant and the searching officer.

-33-

{**¶63**} Therefore, based on the totality of the information presented, we conclude that Chief Deputy Fittro acted in objectively reasonable reliance on the issued warrant. *See State v. Gibson*, 2025-Ohio-5497, ¶ 37 (5th Dist.). Thus, the good-faith exception applies to prevent the suppression of evidence.

{**¶64**} For these reasons, we conclude that the trial court did not err by denying Houser's motion to suppress.

{**¶65**} Houser's second assignment of error is overruled.

{**¶66**} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**MILLER and WILLAMOWSKI, J.J., concur.**

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. *See* App.R. 30.


                                        _____

                                        William R. Zimmerman, Judge


                                        _____

                                        Mark C. Miller, Judge


                                        _____

                                        John R. Willamowski, Judge

DATED:
/hls